United States District Court
Southern District of Texas

**ENTERED**

February 14, 2018

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RONALD EUGENE NUNLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-0072 |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 14) and Defendant's Cross-Motion for Summary Judgment (Doc. 18). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED** and Defendant's motion be **DENIED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner ("Commissioner" or "Defendant") regarding Plaintiff's claim for

---

[1]     Carolyn W. Colvin was the Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 5, Ord. Dated Jan. 24, 2017.

disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act ("the Act").

On June 11, 2012, Plaintiff applied for disability insurance benefits and supplemental security income benefits claiming an inability to work since October 1, 2011, due to seizures, migraines, panic attacks, high blood pressure, and insomnia.[3]  On December 12, 2012, the SSA found Plaintiff not disabled at the initial level of review.[4]  On May 13, 2013, the SSA again found Plaintiff not disabled upon reconsideration.[5]

On June 19, 2013, Plaintiff requested a hearing before an ALJ.[6]  ALJ Allen Erickson ("Erickson") granted Plaintiff's request and scheduled the hearing on March 11, 2014.[7]  Prior to the hearing, Plaintiff's representative filed a brief in which he proposed that Plaintiff was "disabled due to seizure disorder which would render him absent from work multiple times per month, preventing work activity at any exertional level."[8]

The attorney also requested that ALJ Erickson issue a subpoena

---

[3]     See Tr. 177-82, 312, 316, 344.

[4]     See Tr. 149-50, 155-56.

[5]     See Tr. 151-54, 196-99.

[6]     See Tr. 200-02.

[7]     See Tr. 212-16.

[8]     Tr. 425 (emphasis omitted); see also Tr. 424, 426.

2

requiring the "vocational witness to [take] to the hearing certain documents upon which they [sic] may rely in forming opinions during the course of the hearing[,]" particularly focusing on statistical sources for the "numbers of jobs that exist in various labor markets, nationally, regionally, and locally, and for a variety of occupations."[9]   In the attorney's opinion, that supporting documentation was necessary to allow him to "adequately cross examine the vocational witness or to test this testimony to determine if it is even admissible as 'substantial evidence.'"[10]

Alternatively, the attorney requested that he be provided, prior to the hearing, with the data sources on which the vocational expert ("VE") intended to rely to form the opinion on the number of jobs in the local, regional, and national economies.[11]  If one of the sources was experience, the attorney requested that the VE provide additional information about her training, education, or experience that qualified her to offer an opinion on job incidence.[12]  Additionally, the attorney objected to allowing the VE to testify: (1) on job-incidence data based on the inability to accurately estimate job incidence per code listed in the Dictionary of Occupational Titles ("DOT"); and (2) on the assigned VE's

---

[9]      Tr. 421; see also Tr. 422-23.

[10]      Tr. 421.

[11]      See Tr. 422.

[12]      See id.

competency to make such estimations.[13]

At the hearing, ALJ Erickson noted the objections and denied the requests posed in the attorney's pre-hearing brief.[14]   ALJ Erickson represented that he would consider anything offered post-hearing.[15]   The attorney did not file a post-hearing brief.   ALJ Erickson issued an unfavorable decision on July 21, 2014, finding that Plaintiff was not disabled because he did not have any severe impairment or combination of impairments.[16]

Plaintiff appealed the decision and filed a brief addressed to the Appeals Council that described four errors in ALJ Erickson's decision: (1) failing to include in the residual functional capacity ("RFC") the limitations that resulted from Plaintiff's mental illness although finding it to be a severe impairment;[17] (2) basing the decision, in part, on Plaintiff's failure to seek treatment for his condition; (3) failing to address in the RFC finding all basic work activities associated with Plaintiff's mental impairments; and (4) failing to consult a VE about the impact of Plaintiff's severe non-exertional limitations.[18] On March

---

[13]   See id.

[14]   See Tr. 34.

[15]   See id.

[16]   See Tr. 157-67.

[17]   The attorney erred in stating that ALJ Erickson found "mental illness" to be a severe impairment. ALJ Erickson found that none of Plaintiff's impairments was severe.  See Tr. 163.

[18]   See Tr. 255, 428-29.

3, 2015, the Appeals Council remanded the case to an ALJ to reevaluate the medical record, to proceed beyond the severity step, to give further consideration to Plaintiff's RFC, to provide appropriate rationale and cite record evidence, and, if warranted, to obtain supplemental evidence from a VE.[19]  After remand, ALJ Mark Dowd ("Dowd") scheduled a hearing on August 17, 2015.[20]

Four days prior to the hearing, Plaintiff's attorney filed a pre-hearing brief, arguing several theories supporting the award of benefits.[21]  Specifically, he argued that Plaintiff's impairments met or medically equaled the severity of several regulatory listings[22] (the "Listings") and that Plaintiff either met a medical-vocational guideline[23] directing a finding of disabled or his severe impairments prohibited sustained employment.[24]  In the brief, Plaintiff's attorney raised no objections to the assigned VE's sources, testimony, or qualifications or to any other evidence or matter.[25]

## C.  **Hearing**

---

[19]     See Tr. 173-75.

[20]     See Tr. 274-78.

[21]     See Tr. 456-72.

[22]     See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[23]     See 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[24]     See Tr. 462-71.

[25]     See Tr. 456-72.

5

At the hearing, Plaintiff and a VE testified.[26]  ALJ Dowd engaged Plaintiff in a lengthy discussion about his work history.[27] ALJ Dowd also questioned Plaintiff about his impairments.[28]  ALJ Dowd turned the questioning over to Plaintiff's attorney who delved into Plaintiff's access to medical care, as well as eliciting additional testimony on Plaintiff's symptoms.[29]

After Plaintiff's testimony concluded, ALJ Dowd turned to the VE for questioning on vocational factors.[30]  ALJ Dowd first asked whether Plaintiff's attorney objected to the VE's qualifications.[31] The attorney's exact, complete, and uninterrupted response was: "To the -- yes, the numbers.  Yes, your honor.  That is 29E[32] I believe. Indeed.  Belated.  I think that is right.  Belated, your honor is the brief.  I think is at actually the brief.  I wanted to -- is it the standard of lifting?"[33]  ALJ Dowd responded: "Yeah.  Okay.  So, I am going to go ahead and overrule your objection and we will

---

[26]    See Tr. 93-148.

[27]    See Tr. 99-106.

[28]    See Tr. 103-20.

[29]    See Tr. 119-27, 129-31.

[30]    See Tr. 131.

[31]    See id.

[32]    Exhibit 29E is a letter from the SSA to Plaintiff's attorney regarding the review and submission of post-remand, pre-hearing evidence.  See Tr. 441-51.

[33]    Tr. 131.

allow [the VE] to give her expert testimony."[34]

ALJ Dowd began the examination of the VE by asking her to classify Plaintiff's prior work and then followed her response with the question whether a hypothetical individual with Plaintiff's limitations would be able to perform his past relevant work.[35]   The VE testified that the individual would be unable to perform Plaintiff's prior jobs but would be able to perform other work.[36] The VE identified three jobs and provided job-incidence data in Texas and in the nation for each position identified.[37]   ALJ Dowd revised his hypothetical query, which prompted the VE to reduce the representative other work to two jobs.[38]   ALJ Dowd completed his examination of the VE with a question about transferable skills.[39]

Plaintiff's attorney identified additional limitations and asked how they would affect the number and types of jobs available in the economy.[40]   He then inquired about the source on which the VE relied for the job-incidence numbers that she had cited.[41]   The VE answered that she relied on "a variety of sources, but mainly I

---

[34]   Id.

[35]   Tr. 132-33.

[36]   See Tr. 134.

[37]   See id.

[38]   See id.

[39]   See Tr. 135.

[40]   See Tr. 136-39.

[41]   See Tr. 139.

use the [SkillTRAN software] methodology."[42]   The cross-examination
continued:

> Q    [by Plaintiff's attorney] [SkillTRAN]. Okay. And
> what is skilled -- are you aware of what the methodology
> that [SkillTRAN] uses or the process they use to
> determine the jobs?
>
> A    [by VE] I am aware, yes.
>
> Q    Okay. Can you explain that for me?
>
> A    Well, it is a complicated process and I can't
> memories [sic] it.  It is publicly on their website that
> you can go to on any --
>
> Q    Okay.
>
> ALJ: And as you use [SkillTRAN], I mean, is this a
> process that the agency has recognized as viable or that
> the agency knows that is being used or using this and --
>
> VE:  Yes.
>
> ALJ: Again, to determine that it is a reliable means of
> obtaining job numbers?
>
> VE:  Yes, and Social Security experts use [SkillTRAN] as
> well.
>
> ALJ: So, they rely on it as well at the agency level.  Go
> ahead, Mr. Hughes [Plaintiff's attorney], okay.
>
> ATTY: Your honor, Social Security hasn't recognized
> [SkillTRAN] or it would have taken administrative notice
> of it and it hasn't done that, so --
>
> ALJ: Well, why do you think that they haven't?
>
> VE:  Well, I know that they have purchased it and it is
> active and all the judges have access to it, so I would
> assume that --
>
> ALJ: Through the agency website?

---

[42]    Id.

VE:  Yes.

ALJ: Mr. Hughes, were you aware of that or were you --

ATTY: Through SSA.GOV? [SkillTRAN] is accessible through SSA.GOV or are we talking about the --

VE:  No.  The judges have access to [SkillTRAN].

ALJ: And through -- do you know what website it is through?

VE:  I can --

ALJ: Is it through an agency?

ATTY: I am myself looking it up to be honest.  And [the VE], you had indicated earlier that [SkillTRAN] was a program or a process which the agency has recognized to result in a [sic] viable job numbers.  What -- why is that?

VE:  Because it is my understanding that they have purchased it --

ATTY: Okay.

VE:  -- based on this type of disability service.

ATTY: All right.

VE:  Okay.  I could not -- I cannot speak for everybody.

ATTY: Okay.

ALJ: Mr. Hughes, does that --

ATTY: Sorry.  I was -- [VE], did you have the website? Did they -- did the judges have --

VE:  It is an internal process to my understanding.

ATTY: Okay.

VE:  Not to the SS --

ATTY: Okay.

```
ALJ: Let me see if I can find it.  Hang on one moment.
Access to more programs than I can use.  Let me see if I
can look it up here.

ATTY: Okay.

ALJ: Go ahead, Mr. Hughes, while I look it up.[43]
```

While ALJ Dowd searched his computer for the SkillTRAN program, Plaintiff's attorney continued his cross-examination.[44] He asked the VE if, were he to use the SkillTRAN program, whether he would reach the same job-incidence numbers.[45]  The VE explained that the attorney would not necessarily reach the same conclusion, in part, because he was not a VE with years of experience and, in part, because the job-incidence numbers were estimates.[46] Plaintiff's attorney inquired how the VE utilized her experience to determine job-incidence numbers.[47]  The VE said, "I do, based on my surveys on a regular basis.  I meet and I have met thousands of clients.  So, I hear how jobs are performed and it -- the DOT is at best -- obsolete and old, so we have to use our own background and experience."[48]  When pressed on her use of labor market studies in the testimony she was offering, the VE stated that she relied on

---

[43]    Tr. 140-42.

[44]    See Tr. 142-43.

[45]    See id.

[46]    See Tr. 142.

[47]    See Tr. 143.

[48]    Id.

research that she had "learned from contacting employers and job descriptions," including labor market surveys she had conducted in the past.[49]

At that point, ALJ Dowd interrupted the cross-examination, reporting that he had found the SkillTRAN program.[50]  He continued:

> ALJ: . . . . It doesn't appear in my just limited access here.  It is not a website that I have access but it is a recognized [SkillTRAN] and it fits out of the -- it was issued by the office of the chief administrative law judge.  So, it does appear that the agency has some acceptance of the [SkillTRAN] method.  But it is not a website I can give you, Mr. Hughes.
>
> . . . .
>
> ALJ: And I do see that it says www.Skilltran.com, but that is just the one that is --
>
> ATTY: Right.  That is just where they sell their product.
>
> ALJ: Okay.
>
> ATTY[:] [VE], have you done anything to verify that the information that [SkillTRAN] provides is accurate?
>
> VE: Well, I have so many hours of [SkillTRAN] and they use a variety of resources, but my job is not to be a statistician to figure out if their numbers are correct.
>
> ATTY: Okay.
>
> ALJ: So, the answer is --
>
> VE:  No.[51]

Plaintiff's attorney continued to explore what the VE knew about

---

49  Id.

50  See id.

51  Tr. 143-44.

the reliability of the data in the SkillTRAN program.[52]  The VE said that SkillTRAN's methodology explained how the information had been verified, but she did not know if it had been subjected to peer review.[53]

Plaintiff's attorney moved to details concerning how the VE reached the job-incidence numbers that she provided for the jobs cited.[54]  In response to the attorney's question whether the job-incidence numbers corresponded directly to the DOT job codes the VE cited, the VE admitted that the DOT job codes could not match up "in a one to one correlation only for small percentages of the DOT."[55]  Plaintiff's attorney asked, "Do you know how many DOT job codes the numbers you cited contained?"[56]  To illustrate what he meant, Plaintiff's attorney asked about one of the jobs cited, laundry worker, which the VE indicated had a job incidence of 6,000 positions in Texas.[57]  "S[o], that 6,000 number, does that directly correspond to that particular DOT code or does it encompass multiple DOT codes?"[58]

VE:  I have already answered that.   There is [sic]

---

[52]    See Tr. 144-45.

[53]    See id.

[54]    See Tr. 145.

[55]    Id.

[56]    Id.

[57]    See id.

[58]    Id.

several DOT codes.

Q [by Plaintiff's attorney] Okay, okay.  So, how many DOT codes does that 6,000 represent?

A [by VE] Each one would have to be researched.  There is [sic] probably about 20 jobs, cleaners, in the code.

Q    Okay.  So, that 6,000 number represents you said approximately 20 different cleaners.

A    No, that has been reduced.

Q    Okay.  So, I am not following you then.  To 6,000 -- so, all 6,000 of those are -- is it your testimony that there is [sic] approximately 6,000 laundry workers . . . in Texas?

A    Right, but the Census will say there is [sic] 300,000 today.  A cleaner.

Q    Okay.

A    Based on 20 in the DOT --

.  .  .  .

Q    Okay.  And how did you reduce that? Did the program [SkillTran] reduce that for you?

A    With their [sic] assistance and with the Occupational Handbook, with my experience with the Texas [Workforce] [C]ommission, from my experience doing labor market surveys, that has been reduced.  It is not an exact number. It is an estimate.[59]

At the conclusion of his cross-examination, Plaintiff's

attorney stated:

[W]e would like to renew the objection of the request for the documents, since [the VE's] testimony is that she has used these labor market studies in the past as part of her experience.  In order to fully vet her testimony we would need access to those documents.  So, we request

---

[59]    Tr. 145-46.

that [the VE] turn over any labor market studies or studies that she has used today to aid her in coming up with these reduced numbers."[60]

ALJ Dowd denied the request, stating, "This is a non[-]confrontational hearing and I think she has been cross[-]examined fully."[61] Plaintiff's attorney offered a closing statement, and ALJ Dowd said to Plaintiff, "[T]hat ends your hearing."[62]

On September 29, 2015, Plaintiff's attorney filed a post-hearing memorandum.[63]  Therein, he raised multiple objections directed at the VE's testimony and attached multiple exhibits related to vocational evidence.[64] The attorney objected to: (1) the Commissioner's reliance on the VE's inconsistent testimony; (2) the VE's "testimony that the positions offered [as other work] exist[ed] in significant numbers in the national economy and [could] be performed within the parameters of the proposed hypotheticals [sic], based upon the vocational witness'[s] use of SkillTRAN's Job Browser Pro to report job incidence data by DOT Code;" (3) the VE's "offering sample DOT titles with job numbers representing larger occupational groups;" (4) the VE's testimony that the cited jobs, as described in the DOT, could be performed by

---

[60]    Tr. 147.

[61]    Id.

[62]    Tr. 148.

[63]    See Tr. 473-79.

[64]    See Tr. 473-511.

14

an individual with the hypothetical limitations; (5) the positions cited by the VE because those positions require more than occasional interaction with coworkers and supervisors; and (6) the issuance of an unfavorable decision prior to allowing the opportunity to address the objections to evidence and inconsistencies.[65]

## D.  **Commissioner's Decision**

On November 10, 2015, ALJ Dowd issued an unfavorable decision.[66]  ALJ Dowd found that Plaintiff had not engaged in substantial gainful activity since October 1, 2011, the alleged onset date.[67]  ALJ Dowd recognized the following impairments as severe: "hypertension; migraines; seizure disorder; tremors; depressive disorder, not otherwise specified; and anxiety disorder also assessed as panic disorder."[68]  ALJ Dowd found that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of any Listing.[69]

In reaching his RFC determination, ALJ Dowd found Plaintiff's subjective statements not to be entirely credible, citing Plaintiff's daily activities, inconsistencies in Plaintiff's

---

[65]    Tr. 473-78.

[66]    See Tr. 9-22.

[67]    See Tr. 14.

[68]    Id. (emphasis omitted).

[69]    See Tr. 15-16.

reports and testimony, notes for his physical examination, and noncompliance with medication.[70]   Relying on the VE's testimony about the occupational opportunities for the hypothetical individual presented, ALJ Dowd found Plaintiff unable to perform his past relevant work but able to perform the representative jobs of laundry worker and hand packager.[71]   Further relying on the VE's testimony, ALJ Dowd concluded that the two cited representative jobs constituted "other work that exist[ed] in significant numbers in the national economy."[72]   Therefore, ALJ Dowd found that Plaintiff was not disabled at any time from the alleged onset date to the date of ALJ Dowd's decision.[73]   ALJ Dowd addressed none of the post-hearing objections raised by Plaintiff's attorney.

On December 31, 2015, Plaintiff appealed ALJ Dowd's decision.[74] On January 27, 2016, Plaintiff's attorney filed an appellate brief, arguing that ALJ Dowd erred: (1) by not evaluating all of the record evidence and not resolving apparent conflicts in the vocational testimony; (2) by "not adequately addressing post-hearing objections[;]" (3) in failing to grant or deny the request for a subpoena for the VE's "underlying methodology and/or work

---

[70]     See Tr. 18-19.

[71]     See Tr. 20-21.

[72]     Tr. 22; see also Tr. 21.

[73]     See Tr. 22.

[74]     See Tr. 7-8.

product[;]"[75]   and   (4)   in   failing   to   include   all   limitations
resulting from Plaintiff's severe impairments.[76]   On November 15,
2016, the Appeals Council denied Plaintiff's request for review,
acknowledging the filing of post-decision brief but not discussing
the "reasons [Plaintiff] disagree[d] with the decision," thereby
transforming ALJ Dowd's decision into the final decision of the
Commissioner.[77]   After   receiving   the   Appeals   Council's   denial,
Plaintiff timely sought judicial review of the decision by this
court.[78]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner
denying disability benefits is limited to the determination of
whether: 1) the ALJ applied proper legal standards in evaluating
the record; and 2) substantial evidence in the record supports the
decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

A claimant is disabled if he is unable "to engage in any
substantial   gainful   activity   by   reason   of   any   medically
determinable physical or mental impairment. . . which has lasted or
can be expected to last for a continuous period of not less than 12

---

[75]     The record includes no request for a subpoena addressed to ALJ Dowd.
The only request for subpoena in the record was filed prior to the first hearing.
See Tr. 421-23.  ALJ Erickson explicitly denied the request at the first hearing.
See Tr. 34.

[76]     Tr. 513; see also Tr. 512.

[77]     Tr. 2; see also Tr. 1, 3-4.

[78]     See Tr. 2-3; Doc. 1, Pl.'s Compl.

months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the burden of proof on the first four steps, but the burden "shifts to the Commissioner at the fifth step to establish the existence of other available substantial gainful employment that a claimant can perform."  Kneeland v. Berryhill, 850 F.3d 749, 753-54 (5th Cir. 2017).

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  If the findings of fact contained in the Commissioner's decision are supported by substantial record

evidence, they are conclusive, and this court must affirm.   42 U.S.C. § 405(g).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.   Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

### III. Analysis

Plaintiff requests judicial review of ALJ Dowd's decision to deny disability benefits.   Plaintiff asserts that ALJ Dowd's decision contains two errors, one of which is that ALJ Dowd did not follow proper legal standards in response to objections and the other of which is that the RFC determination was not supported by substantial evidence.   The court finds merit in Plaintiff's argument that ALJ Dowd committed a legal error by failing to address and rule on Plaintiff's post-hearing objections.   As explained below, the court finds that this error alone requires remand, and, thus, the court does not address any other issue.

The SSA's Hearings, Appeals and Litigation Law manual ("HALLEX") contains "guiding principles, procedural guidance, and information" for the SSA's disability staff.   HALLEX § I-1-0-1. Pursuant to Fifth Circuit precedent, HALLEX "does not carry the authority of law;" however, the agency must follow its own procedures where they affect the rights of individuals.   Morgan v. Colvin, 803 F.3d 773, 777 (5th Cir. 2015)(quoting Newton v. Apfel,

209 F.3d 448, 459 (5th Cir. 2000)).  "[I]f prejudice results from a violation, the result cannot stand."  Id. (quoting Newton, 209 F.3d at 459).  "Prejudice can be established by showing that the additional considerations might have led to a different decision." Mettlen v. Barnhart, 88 F. App'x 793, at *1 (5th Cir. 2004)(unpublished)(quoting Newton, 209 F.3d at 458).

HALLEX outlines very specific requirements regarding the treatment of a VE's testimony.  See HALLEX § I-2-5-55, I-2-6-74. Prior to updates in June 2016, HALLEX § I-2-5-55[79] stated, "If a claimant raises an objection about a VE's opinion, the ALJ must rule on the objection and discuss any ruling in the decision."[80] By its terms, the text applied to all objections regardless of when they were filed.[81]

---

[79]    Plaintiff cites to HALLEX I-2-5-58 but quotes HALLEX I-2-5-55.  The incorrect citation was clearly nothing more than an error on Plaintiff's part.

[80]    Since the 2016 updates, HALLEX I-2-6-74 includes a provision that addresses the ALJ's responsibility to rule on objections, stating that the ALJ "may address the objection(s) on the record during the hearing, in a narrative form as a separate exhibit, or in the body of his or her decision."

[81]    In this case, Plaintiff's attorney filed a pre-hearing brief but raised no objections therein.  At the hearing, he and ALJ Dowd discussed an objection to the VE's qualifications that ALJ Dowd overruled.  Even though the two of them seemed to know what it concerned, the objection as recorded in the hearing transcript was nonsense.  Possibly, they were referring to objections raised before Plaintiff's first hearing.
    Also, at the end of the second hearing, Plaintiff's attorney "renewed" a request for production of the labor market studies that the VE used in reaching the job-incidence numbers, apparently referring to a request that was submitted prior to the first hearing.  ALJ Dowd overruled the objection, stating that the hearing was intended to be non-confrontational and the VE had been fully cross-examined.
    ALJ Dowd ended the hearing without officially closing evidence or offering Plaintiff's attorney additional time to submit evidence and/or briefs. Plaintiff's attorney made no request for additional time.  However, in a post-hearing brief, he raised objections that ALJ Dowd had not previously addressed on the record.  Defendant does not object to the propriety or the timeliness of

Six weeks after the hearing, Plaintiff's attorney filed a post-hearing brief that raised six objections, five of which directly challenged the VE's testimony.  In his decision, ALJ Dowd did not acknowledge the brief or the objections, much less offer rulings and discussion on the objections.  ALJ Dowd's failure to address the post-hearing objections was a clear violation of HALLEX I-2-5-55 and, therefore, a legal error.  Thus, the question before the court is whether that failure affected Plaintiff's substantial rights.  The court is most concerned with two objections to the VE's methodology for determining job-incidence numbers.[82]  Central to the objections are the VE's use of SkillTRAN and the VE's methodology for reducing the job-incidence statistics from larger occupational groups to the specific representative jobs the VE identified by DOT code.  Accordingly, the answer on prejudice

---

Plaintiff's post-hearing objections.

[82]   This category of objections to the VE's testimony is trending nationwide with mixed results that are largely due to procedural and factual differences among cases.  See, e.g., Pedone v. Berryhill, Civil Action No. 16-cv-02767-STV, 2018 WL 460063, at **6-8 (D. Colo. Jan. 18, 2018)(slip copy); Moffit v. Berryhill, CIVIL ACTION No. 17-4015-JWL, 2018 WL 276770, at **2-3, 5-6 (D. Kan. Jan. 3, 2018)(slip copy); James v. Colvin, CIVIL ACTION NO. 16-470-EWD, 2017 WL 4185479, at **9-11 (M.D. La. Sept. 21, 2017)(slip copy); Barlow v. Berryhill, 2:15-CV-0180, 2017 WL 1157211, at *8 (N.D. Tex. Mar. 10, 2017)(slip copy); Hancock v. Comm'r of Soc. Sec., 6:15-CV-206-Orl-DNF, 2016 WL 4927642, at *3 (M.D. Fla. Sept. 16, 2016)(unpublished).  A few district court opinions shifted the step-five burden from the Commissioner to the plaintiff by requiring the plaintiff to demonstrate that the VE's testimony is unreliable.  See, e.g., James, 2017 WL 4185479, at *11 ("Plaintiff has failed to show that the VE's testimony regarding the number and type of occupations available to someone with Plaintiff's RFC is unreliable . . . .");  Barlow, 2017 WL 1157211, at *8 ("[P]laintiff has failed to present . . . evidence of . . . how the VE's vocational numbers were flawed . . . .").  Also trending are challenges to ALJ decisions based on the failure to rule on all objections proffered.  See, e.g., Pedone, 2018 WL 460063, at *6; Moffit, 2018 WL 276770, at **2-5; James, 2017 WL 4185479, at **9-10; Hancock, 2016 WL 4927642, at **3-4.

depends on whether the VE's testimony amounted to substantial evidence in support of a finding that Plaintiff could perform other work.

At step five, the Commissioner bears the burden of establishing "the existence of other available substantial gainful employment that a claimant can perform." Kneeland, 850 F.3d at 753-54. The burden includes the "duty to fully and fairly develop the facts relative to a claim for disability benefits." Carey, 230 F.3d at 142. That duty which necessarily encompasses step-five vocational evidence.

The Commissioner can meet her burden through the production of substantial evidence "that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [his RFC] and vocational factors." 20 C.F.R. §§ 404.1560(c), 416.960(c); see also 20 C.F.R. §§ 404.1520(g)(1), 404.1566(a), 416.920(g)(1), 416.966(a). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. §§ 404.1566(a), 416.966(a).

VEs are valuable as sources of occupational evidence, particularly in providing the number of positions in the national economy for each specific DOT job code; however, the reliability of their testimony is not a foregone conclusion. See Carey, 230 F.3d at 145; 20 C.F.R. §§ 404.1566(e), 416.966(e); SSR 00-4p, 2000 WL

1898704, at *2.   For example, when a VE's testimony directly and obviously conflicts with the DOT on exertional level or skills required for a particular job, the probative value and reliability of that testimony is called into question.   See Carey, 230 F.3d at 147; SSR 00-4p, 2000 WL 1898704, at *2.   The ALJ may rely on a VE's testimony only when "the record reflects an adequate basis for doing so."   Carey, 230 F.3d at 146 (discussing the resolution of conflicts between the VE's testimony and the DOT); see also SSR 00-4p, 2000 WL 1898704, at *2.   The Seventh Circuit explains it this way:   "[B]ecause an ALJ's findings must be supported by substantial evidence, an ALJ may depend upon expert testimony only if the testimony is reliable."   McKinnie v. Barnhart, 368 F.3d 907, 910 (7th Cir. 2004)(addressing vocational expert testimony).

The SSA takes "administrative notice of reliable job information available from various governmental and other publications[,]" including the DOT, the Occupational Outlook Handbook, and census reports.   20 C.F.R. §§ 404.1566(d), 416.966(d).   Here, the vocational expert relied on SkillTRAN, a privately created software program not listed among the reliable sources identified in the regulations.   Her methodology for determining job incidence relied on data she acquired through SkillTRAN.   Therefore, in order to determine the reliability of the VE's testimony, ALJ Dowd had affirmative duties to fully develop the record and to make a finding on the reliability of SkillTRAN.

23

At the hearing, considerable discussion and research was dedicated to determining whether the SSA recognized SkillTRAN as reliable, but the result was inconclusive. Although the VE testified that the SSA recognized SkillTRAN as reliable, further discussion called that assertion into question. When confronted with the opposite assertion, the VE equivocated, stating, at one point, that she could not speak for everyone.

ALJ Dowd expressed no familiarity with SkillTRAN and researched his access to the program while the VE explained her job-incidence methodology to Plaintiff's attorney. His inattentiveness during this crucial testimony on the VE's use of SkillTRAN and calculation of job incidence for specific DOT job codes raises the question whether ALJ Dowd actually considered the reliability of the VE's testimony. Moreover, ALJ Dowd's research led to the conclusion only that SkillTRAN was accorded "some acceptance" by the SSA, certainly not a ringing endorsement.[83] Even then, the website address that he located was devoted to sales, not program access.

ALJ Dowd and Plaintiff's attorney asked the VE questions about the program. Yet, the VE's responses fell well short of explaining the methodology or endorsing the data underlying SkillTRAN's numbers. Although she said that she was aware of the methodology the software utilized, she dodged the opportunity to explain it,

---

[83]    Tr. 144.

24

describing it only as a complicated process.  The VE admitted that she had not tested the accuracy of the information provided by SkillTRAN and was unaware of whether it had undergone any peer-review process.  She argued that it was not her job to assess the accuracy of the program.  Additionally, although the VE asserted that Social Security experts used SkillTRAN, she made no representation that professionals in the industry found it to be reliable, accurate, and/or consistent with their experience and research.

Absent testimony or other evidence of either the SSA's acceptance of SkillTRAN as a reliable source or the VE's endorsement of the accuracy of SkillTRAN's data, the record lacks substantial evidence of the reliability of SkillTRAN or the VE's job-incidence calculations that relied on SkillTRAN data.[84]  ALJ Dowd failed to fully develop the record on the reliability of the VE's testimony and provided this court with insufficiently specific findings on the reliability of either SkillTRAN or the VE's job-incidence testimony to fulfill the Commissioner's step-five burden of showing that other jobs that Plaintiff could perform existed in significant numbers in the national economy.

If ALJ Dowd had considered Plaintiff's objections, he also may have concluded that the record lacked substantial evidence to

---

[84]    ALJ Dowd's statement that he found the VE's testimony consistent with the DOT and credible does not satisfy the Commissioner's burden of producing substantial evidence in support of his step-five determination.  See Tr. 20-21.

support his finding at step five and may have changed his decision. Alternatively, he may very well have sought additional evidence and ultimately determined the VE's testimony was reliable.  The court cannot know because ALJ Dowd did not address the objections.  The case should be remanded for further consideration of the reliability of SkillTRAN and the VE's testimony, including development of the record and an explanation of the ALJ's reliability determination.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED** and Defendant's motion be **DENIED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this $\underline{14^{th}}$  day of February, 2018.

26

U.S. MAGISTRATE JUDGE